Nicholson, C. J.,
delivered', the opinion of the court.
On the 14th of April, 1868, a patent issued to E. N. Horsford, his executors, administrators or assigns, by which was secured to him the full and exclusive right and liberty of making, using and vending the invention of preparing acid phosphate of lime for the purpose of raising bread.
On the 28th of July, 1868, Horsford assigned, sold and set over to the Rumford- Chemical Works, all his right, title and interest in the said invention, to be held for their own use and that of their successors and assigns
On the 1st of February, 1869, the Rumford Chemical Works in consideration of the agreement of even date, entered into with Allen F. Morgan, sold, assigned and transferred to the said Morgan the right to use, within prescribed limits of territory, Horsford’s Patent Cream of Tarter substitue for the purpose of manufacturing self-rising cereal flours, with the right to use and sell the flours so manufactured.
The agreement of even date ’recites, that because the Rumford Chemical Works have licensed and granted unto Allen F. Morgan .the exclusive right to manufacture, sell and use during the term of five years from the date thereof, the article known as self-rising flour, from cereals, by Horsford’s patent pulver-ulent phosphoric acid, in the territory described; and because of other good and sufficient reasons, he has *324 agreed, and doth covenant and agree, to and with the Kumford Chemical Works, that he will immediately commence the manufacture of self-rising flour in accordance with the written instructions of said Rumford Chemical Works, and will use his business tact and skill to introduce and sell the same, during the continuance of the license aforesaid. And the said Allen F. Morgan, further agrees to accept in the aforesaid license such rights as are covered by the patents granted to Ében U. Horsford and assigned by him to said Rumsford Chemical' Works, and to maintain them at his own costs and expense in suits at law, and to purchase all of the acid used in making his self-rising flour of the Rumford Chemical Works, or their agents, as directed, and in case of his failure to perform the covenants and agreements thereby entered into, it should be lawful for the Rumford Chemical Works to annul and revoke their said license and to terminate the agreement.
On the 15th of February, 1869, an agreement was made between Morgan, of the first part, and Oliver, Finnie & Co., of the second part, for the purpose of having prepared, in connection with the grocery business of Oliver, • Finnie & Go., the self-rising flour, under the authority of the exclusive privilege granted to Morgan for preparing said flour.
Morgan agreed to furnish the necessary flour preparing mills, all tools, fixtures and implements needed by himself with which to prepare the flour. He was also to furnish his own time and supervision of the business, and in case of his absence to fill his place with a *325 competent man, and to furnish, at his own expense, all the labor or laborers he might require in the business; also, to keep himself possessed of the right to prepare such flour and the privilege of purchasing the ingredients, etc.
Oliver, Finnie & Co. were to furnish, at their own expense, all the flour and buckwheat demanded by the “sale or • trade of the self-rising flour, and to furnish all the ingredients, and the cotton and paper bags, fuel, lights, and ample room in. their store, to pay all taxes, insurance, and not to become competitors or bidders against said Morgan for his exclusive right to prepare self-rising flour, at the as-signee’s sale of same, in the bankrupt case of Morgan, or in any other way or manner whatever. They agreed to pay to Morgan for every barrel of wheat flour and buckwheat flour, prepared by him or under his right, the sum of $1.25, the agreement to remain in force until the 1st of April, 1870.
Under this agreement, the business of preparing the self-rising flour was carried on until the 19th of April, 1869 — two months and a few days — when Morgan died. Oliver, Finnie & Co. continued the business after his death, having immediately procured from the Rumford Chemical Works a contract similar in all respects to that which Morgan had with them, they assuming that their contract with, or license to Morgan, was annulled and revoked .by his death.
In June, 1869, Kate G. Morgan administered on the estate of her husband, Allen F. Morgan, claimed the right to carry out the contract between him and *326 Oliver, Finnie & Co., and offered to them to superintend the business, and execute the agreement of her intestate. Oliver, Finnie & Co. denied her right to execute the agreement, insisted that her intestate’s interest was merely a license, which was terminated by his death and that they had the right to carry on • the business under their arrangement with the Rum-' ford Chemical Works.
She thereupon commenced her suit in the First Circuit Court of Shelby county, on the articles of agreement entered into between her intestate and Oliver, Finnie & Co., claiming compensation according to that agreement for $1.25 on each barrel of flour so prepared from the date of the agreement down to the 1st of April, 1870, when the agreement expired.
Upon ■ the trial, under the instructions of the court, the jury found a special verdict as follows: “That from the 15th of February, 1866, to the 19th of April, 1869, Morgan made four hundred and one barrels • of flour, making $501.25, at $1.25 per barrel, and that Morgan had received from Oliver, Finnie & Co., $552.58. That Oliver, Finnie & Co. made, from May 1, 1869, to April 1, 1870, one thousand two hundred and thirteen barrels of flour, which, at $1.25 amounts to $1,516.25. That two hundred barrels per month ought to have been made for eleven and one-third months, which would make 2266. barrels, at $1.25, in all $2,832.50, which amount, if in the opinion of the court the law ' is for the plaintiff, we find for the plaintiff;” etc.
A motion for a new trial having been made, the *327 plaintiff entered a remittal of $120, and thereupon, the court overruled the motion and gave judgment for $2,781.17, allowing $1.25 per barrel on the number made by Morgan, viz: 401; and on 2266, the number that. Oliver, Finnie & Co. ought to have made, deducting the payment and remittal.
Several instructions were asked to be given to the jury, on both sides, which were refused, and a special verdict ordered to be found. The most important of the instructions requested by the defendants involved the question, whether the instrument given by the Rumford Chemical Works to Morgan, on the 1st of February, 1869, conferred upon him the persona] privilege of using the patented process for preparing the self-rising flour, which was annulled and revoked by his death, or whether it vested in him an interest which passed, upon his death, to his personal representative? This question must be determined by the intention. of the parties as manifested by the instrument itself. The consideration of the instrument given by the Rumford Chemical Works to Morgan, is expressed to be the agreement of even date — for that consideration they sell, assign and transfer to Morgan the exclusive right for five years, to use Horsford’s patent for the purpose of manufacturing, using and selling the self-rising flour. By the express terms of the instrument it is a bargain and and sale, and transfer of a right in the patent — it is an exclusive right within a specified territory. It is a sale, transfer and assignment of an exclusive right, for a consideration expressed in an agreement entered *328 into at the same time and as part of the transaction; that consideration was, that Morgan would immediately commence the manufacture of self-rising flour, that he would use all his skill and business tact in introducing and selling the same during the five years, and that he would purchase all of the acid used in making the self-rising flour, from Rumford’s Chemical Works, it was to the interest of the Rumford Chemical Works, that the self-rising flour' should be extensively introduced, as thereby they would reap larger profits by the sale of the acid required in the manufacture. It was therefore a sale, transfer and assignment of a right to use a patented process, to use it exclusively for a specified time and within a specified territory and for a specified valuable consideration. It is wholly immaterial that the right sold, transferred and assigned is denominated a license, or that it is not accompanied by the words executors, administrators or assignsr The language plainly vests in Morgan a right, and it is not less a right ■ because it is called a license. It is a license based on a valuable consideration and not a mere personal privilege. Nor do the Rumford Chemical Works reserve the right to revoke the license at pleasure, they can only revoke it if Morgan should fail to perform the stipulations imposed on.him. His death within the five years, is not embraced as a contingency on which the right is dependant. By the terms of the contract, it is a vested right for five years, and upon his death it passed to his personal representative as assets.
*329 It is next insisted that the • contract between Morgan and Oliver, Finnie & Co., which is sued on, was one that by its own nature was limited in duration to the lifetime of Morgan; that is, that it was a contract for the personal services of Morgan in the supervision and management of the business, hence that his administratrix had no power'as such to carry it on, and that it was extinguished and determined by his death.
The general rule is well settled that the trade of the deceased dies with him, and his personal representative cannot carry it on: 1 Story Cont., sec, 287. But. within this rule is not included the performance and completion of any unfinished executory contracts made by the testator or intestate, which are not essentially personal, such as a contract to build a house or publish a book, when the building or publishing is already commenced: 1 Story Cont., sec. 287, and authorities cited.
The only question then to be considered in this case is: Was the contract on the .part of Morgan with Oliver, Finnie & Co., essentially personal? Morgan owned the right to use the patented process, and the object was to develop its value by using it in the manufacture of self-rising flour. For this purpose he agrees with Oliver, Finnie & Co. that if they will furnish a house, and the 'means of buying the wheat and buckwheat flour and the necessary ingredients, he will superintend the manufacture, or have it done, and provide the necessary labor or laborers, using his patented process, for which services and for the use of *330 his patented process, Oliver, Finnie & Co. agree to pay him $1.25 for every barrel of flour made down to April 1, 1870. It is obvious that the essential 2>art of this contract is not the personal services of Morgan, but the rise of his patented process in the manufacture. Without the use of this, the enterprise would be worth nothing, but the superintendence of the work may as well be carried on by any other competent person as by Morgan.' The contract expressly contemplates that in the absence of Morgan, his place is to be supplied by some other superintendent. His object was to 'benefit the Rumford Chemical Works, as well as himself — such' was his contract with them — and for this purpose it was necessary for him to travel and extend the use and consumption of the manufactured ' article. This is provided for in the contract with Oliver, Finnie & Co., and it shows that the personal supervision, of Morgan was not the essential element in the contract, but that the manufacture could be as. well superintended by another as by him. The case falls, therefore, literally within the rule, that an executory contract may be carried on by a personal representative where it was made by a testator or intestate, and its execution commenced before his death. In this case we have seen that the right to the use of the patented process for five years belonged to Morgan, and that upon his death this right passed to his administratrix. Her intestate has contracted to use this right until the 1st of April, 1870, in manufacturing self-rising flour for Oliver, Finnie & Go. This was a contract which Morgan’s personal repre *331 sentative had the right to carry out, and neither the Rumford Chemical Works, nor Oliver, Finnie & Co., had any right to prevent it.
It is next maintained for defendants that whatever rights Morgan acquired by the transfer to him by the Rumford Chemical Works, on the 1st of February, 1869, were vested in his assignee in bankruptcy. His petition in bankruptcy was filed on the 30ih of May, 1868, and the transfer was made afterward, on the 1st of February, 1869, and was based on a patent granted in April, 1868. Whatever rights Morgan had by transfer under an older patent, may have passed to the assignee or may have been abandoned by him. We see no evidence of any assertion of such claim, nor do we see how such claim could be made, in view of the fact, that moi’e than two years1 had elapsed from the application for bankruptcy to the commencement of this suit, and the further fact that plaintiffs’ claim rests on a sale and transfer made to Morgan, after the date of the bankrupt petition. Besides, defendants recognized Morgan’s right to the patented process, by their contract with him, in -which they bound themselves not to become his competitor for the rights under the patent, either at the bankrupt sale, or in any manner whatever, and the claim which they now set up is not only in violation of that contract, but it is wholly inconsistent with the defence that the title is in the assignee in bankruptcy.
The only remaining question is as to the correctness of the rule adopted by the court, in fixing the amount of damages upon the special verdict. No *332 special objection is urged here to the refusal of the court to give to the jury the several instructions asked for, and in simply directing them to find . the facts in a special verdict. Objection is made however, to the finding of the jury, as to the number of barrels that ought to have been made from the death of Morgan, on the 19th of April, 1869, to the 1st of April, 1870. The instruction of the court was, that the jury should ascertain what number of barrels ought to have been made from the death of Morgan to the 1st of April, 1870. The jury found that two hundred barrels per month ought to have been made for eleven and one-third months, and the court based its judgment on their finding. We are satisfied, that as Oliver, Finnie & Co. went on after Morgan’s death to manufacture flour under his franchise and with his machinery, it was proper to hold them responsible, not only for the flour actually manufactured, but for all that by ordinary diligence, and in view of the demands for the flour in the market, should have been manufactured. We think the evidence fails to show that as much as two' hundred barrels per month ought to have been made by reasonable diligence, and in view of the demands of the market. On this point we think the court was not sufficiently explicit in instructing the jury as to their duty, in ascertaining how many barrels ought to have been made. While the number of barrels actually made did not furnish conclusive evidence as to the number that ought, to have been made, yet in the absence of proof showing any failure in their at *333 tention to the business, or that they failed to keep pace with the demands of the market, as they were interested in making the largest number, the fair presumption would be that they made all that ought to have been made.
In fixing the amount for which plaintiff was entitled to judgment upon the special verdict, the court adopted the price agreed upon by the contract. There was no error in this; defendants went on to manufacture the flour under the contract with Morgan, and his administratrix offered to fulfill the contract on the part of her intestate. This question was settled in the case of Jones v. Jones, 2 Swan, 607. In that case the court said: “ The plaintiff does not pretend that he has performed his part of the contract, hut alleges as an excuse that the defendant refused to receive performance and, discharged him from service. This is a good excuse, and is taken as equivalent to performance, if the defendant was in default and had no right, in view of the facts in the case, to discharge the plaintiff from service. If the defendant had no right to rescind the contract, it is not in point of fact rescinded, but remains obligatory upon him, though he refused on his part to perform it, or to accept performance. In this view of the case, the defendant is liable to the full extent of the wages stipulated in liis contract.”
But it is insisted that as Morgan was bound by the contract to superintend the manufacture in person or to have it done by another, and also to procure all the necessary laborers at his own expense, the *334 court erred iu not submitting the question to the .jury as to the amount for which defendant was entitled to be credited for superintending the manufacture, and procuring the necessary laborers, from the 19th of April, 1869, the date of Morgan’s death, down to the 1st of April, 1870, when the contract expired. This question was fully examined in the case of Jones v. Jones, already cited. In that case an overseer .had been employed for a year, at $275. His employer discharged him without cause, and refused to receive performance. The overseer sued for the whole amount of his wages for the year, and recovered $275. But it appeared in proof, that after being discharged, he obtained employment and earned wages for the residue of the year. The question was: Whether the Circuit Judge ought not to have instructed the jury that the amount so received or earned, should be deducted from the $275? On this point, this court set’ aside the verdict, saying: “ The verdict is evidently founded upon the ground that the plaintiff was improperly dismissed, and is for the full amount stipulated in the contract. But as the term, continuance and circumstances of the second employment were clearly proved, we can see no reason why it was not taken into consideration, and the damages reduced by its reasonable value, in the absence of express proof of the amount paid, unless the jury considered themselves restricted by the terms of the. charge.”
Following this authority, we are of opinion that the Circuit Judge should have submitted to the jury the inquiry as to the reasonable cost incurred by defend *335 ants in procuring the performance of the services which Morgan had undertaken to perform himself or have performed, from the 1st of May, 1869, to the 1st of April, 1870, with the view of reducing the contract price of the barrels of flour made, or which ought to have been made, as already explained.
For the errors indicated, the judgment will be reversed, and a new trial awarded.